UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| JOSEPH B. SHEA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-12233-ADB |
| | * | |
| PETER MILLETT, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO AMEND

BURROUGHS, D.J.

Plaintiff Joseph B. Shea ("Plaintiff") brings this action against Defendant Peter Millett ("Defendant"), asserting claims for breach of contract, promissory estoppel, and violation of Massachusetts General Laws Chapter 93A, and seeking a declaratory judgment and injunctive relief. [ECF No. 15]. Defendant has filed crossclaims for a declaratory judgment, unjust enrichment/restitution, promissory estoppel, and recoupment. [ECF No. 16]. Currently pending before the Court are Plaintiff's motions for leave to file a second amended complaint, [ECF No. 68], and for partial summary judgment, [ECF No. 80], as well as Defendant's motion for summary judgment, [ECF No. 85]. For the reasons set forth below, Plaintiff's motion for leave to file a second amended complaint, [ECF No. 68], and motion for partial summary judgment, [ECF No. 80], are <u>DENIED</u>. Defendant's motion for summary judgment, [ECF No. 85], is <u>GRANTED</u>.

## I.  FACTUAL BACKGROUND

Except as otherwise noted, the following facts are undisputed.[1]  Defendant is an orthopedic surgeon who works at the Steadman Clinic in Vail, Colorado as the director of shoulder surgery.  [ECF No. 105 at 1 ("DSOF")].  Plaintiff and Defendant met in 2001, when Defendant was working in Boston and Plaintiff was a sales representative with Surgi-Care, Inc. ("Surgi-Care"), which was the exclusive New England distributor for orthopedic products manufactured and developed by Arthrex, Inc. ("Arthrex").  [Id. at 1–2].  Reinhold Schmieding ("R. Schmieding") is the president and founder of Arthrex, and John Schmieding ("J. Schmieding") is Arthrex's general counsel.  [Id. at 2].  Plaintiff introduced Defendant to Arthrex in 2001, and Defendant has been a consultant and product development surgeon for Arthrex since 2003.  [Id.].  At a conference hosted by Arthrex in 2003, Defendant came up with the idea to link medial and lateral rows of anchors during surgery in a "mattress double anchor technique," or "MDA."  [Id. at 2–3].[2]  This surgical technique relates to Arthrex's SutureBridge and SpeedBridge products.  [ECF No. 97 at 2 ("PSOF")].

In 2006, Defendant attempted to obtain royalty fees from Arthrex in connection with the SutureBridge products that contained the technology developed by Defendant, but Arthrex

---

[1] The facts are recited from (1) Defendant's reply to Plaintiff's response to Defendant's statement of undisputed facts, which contains both parties' contentions regarding the facts set forth in support of Defendant's motion for summary judgment, see [ECF No. 105], and (2) Defendant's response to Plaintiff's statement of undisputed facts, which contains both parties' contentions regarding the facts set forth in support of Plaintiff's motion for partial summary judgment, see [ECF No. 97].

[2] Plaintiff disputes that this was Defendant's idea, but the dispute does not concern a material fact.  See [DSOF at 2–3].  Defendant acknowledged that he brainstormed the idea with others but testified that he refined the idea.  [ECF No. 93-1 at 15 (Defendant's deposition testimony)].

declined to pay him royalty fees at that time. [PSOF at 2–3]. In early 2009, Defendant began negotiating a royalty agreement with Arthrex connected to Defendant's work on SpeedBridge products, and in March 2009, J. Schmieding sent Defendant a draft royalty agreement for review. [DSOF at 4; PSOF at 4; ECF No. 105-2 at 2 (March 11, 2009 email from Arthrex to Defendant, attaching draft agreement)]. Although Defendant was then working with an individual who was acting as his intermediary in the negotiations, that individual was not involved in the negotiations after April 2009. [PSOF at 5–6]. Defendant did not execute the agreement in March 2009, but he and J. Schmieding resumed discussion of the terms of the agreement again in late 2009 or early 2010. [DSOF at 4; ECF No. 105-5 at 5 (J. Schmieding deposition testimony); ECF No. 88-7 at 4].

Defendant decided that it would be helpful to have someone like Plaintiff, who knew R. Schmieding, to help him negotiate the agreement with Arthrex. [PSOF at 5]. By 2010, although Plaintiff was still working for Surgi-Care, it was no longer distributing Arthrex products. [DSOF at 3]. In March 2010, Plaintiff and Defendant attended a medical conference in New Orleans. [Id. at 5]. During a conference event held at a local bar, Plaintiff and Defendant spoke for ten to fifteen minutes about Defendant engaging Plaintiff to assist him in entering into a long-term royalty agreement with Arthrex. [Id.]. Plaintiff testified that, during that conversation, Defendant offered "15% of what [Defendant] got paid," and Plaintiff said he would rather get 10% over the life of any agreement. [Id. at 6]. Plaintiff further testified that they agreed to this term, although they did not discuss strategy or any additional terms during that conversation. [Id.]. In essence, Plaintiff thinks that they entered into an agreement at this time but Defendant disagrees. [PSOF at 8].

Between March and June 2010, the parties discussed further details about how Plaintiff would help Defendant.  [DSOF at 6–8].[3]  In an email Plaintiff sent to Defendant on April 2, 2010, Plaintiff sent a proposal concerning the following terms relevant to their agreement and asked Defendant to respond with his thoughts: "10 percent of any royalties, consulting fees, equity earned after the first $150,000 per year that you earn."  [DSOF at 12; ECF No. 88-8 at 3]. Plaintiff also referred to "work [he would] perform as [Defendant's] agent and business consultant" and discussed an hourly fee of $200.00 for consulting, including time spent "preparing documents, meeting with potential partners and discussing details, offers and plans with [Defendant]."  [ECF No. 88-8 at 3].  Plaintiff sent a nearly identical email to Defendant on April 7, 2010, this time adding a proposal for a "performance bonus . . . based on the significance of the deal signed with our new partner . . . ."  [DSOF at 12; ECF No. 88-9 at 2].

On June 2, 2010, Plaintiff sent Defendant an invoice for 26.5 hours of consulting work for Defendant at a rate of $200.00 per hour.  [DSOF at 13].  Defendant paid the invoice.  [Id.]. On June 7, 2010, Plaintiff forwarded his April 2nd email to Defendant, asking him to "read it and email to confirm that you have read it and agree."  [Id.; ECF No. 88-8 at 2].  Defendant responded that same day, asking Plaintiff to "clarify [his] thoughts on the payments on royalties and payments on consulting over 150k," noting that he thought this was "for Smith [&] Nephew only."  [DSOF at 13; ECF No. 88-8 at 2].  Defendant also asked, "what is the Term on this?  Is this forever?"  [ECF No. 88-8 at 2].  Plaintiff responded later that day, writing that he thought the 10% applied to "any royalties that [Defendant was] paid by [S]mith [&] [N]ephew or Arthrex" if Plaintiff and Defendant were able to get Arthrex to pay retroactively on the MDA technology.

---

[3] Plaintiff disputes this, arguing that their arrangement was finalized in early April 2010.  [DSOF at 7].  This is belied by the fact that Plaintiff sent Defendant multiple emails in April and June 2010, asking Defendant to clarify the terms of their oral agreement.  See [ECF No. 88-8 at 3; ECF No. 88-9 at 2; ECF No. 88-8 at 2].

[DSOF at 14; ECF No. 88-8 at 2].  "As for the term of the agreement," Plaintiff asked Defendant to "tell me your thoughts . . .  I think it should last as long as you[r] contract with [S]mith and [N]ephew or Arthrex lasts . . . again, if you end up earning significantly more money due to our work together, I would think that 10 percent to me should be a small number . . . [.]"  [ECF No. 88-8 at 2].  Plaintiff then wrote that Defendant could call that night to discuss.  [Id.].  Defendant did not respond to Plaintiff's email.  [PSOF at 14].

Plaintiff's understanding of their oral agreement was that Plaintiff would approach his contacts at Arthrex's competitors to give Defendant leverage in his negotiations with Arthrex as well as additional options in case the Arthrex deal fell through, but that he was not required to actually secure a competing deal for Defendant.  [DSOF at 16–18].  In addition, Plaintiff testified that he committed to trying to get Arthrex to pay Defendant a higher royalty than it typically paid.  [Id. at 17].[4]  Plaintiff had several phone calls and a dinner with a contact at Smith & Nephew and had several conversations with Linvatec Corp. ("Linvatec")—both Arthrex competitors—to discuss working with Defendant.  [Id. at 18–19].  Ultimately, Defendant did not enter into an agreement with either company.  [PSOF at 13; DSOF at 19].

Defendant claims that the parties' arrangement was not limited to working on a deal with Arthrex and that the parties' oral agreement additionally committed Plaintiff to helping Defendant secure other consulting agreements.  [DSOF at 7].  Plaintiff contends that any additional arrangements they discussed were designed only to create leverage for Defendant in securing an agreement with Arthrex, and were not part of a plan for Plaintiff to actually perform

---

[4] Plaintiff disputes this in his response to Defendant's statement of facts but testified to it during his deposition.  [DSOF at 17 (disputing that this was a requirement of their agreement); ECF No. 88-3 at 36 ("My services or my obligation to him for the money I received and we agreed on was to get Arthrex to agree to pay him, not only pay him, but pay him more than they typically paid people.")].

longer-term work in securing other business opportunities for Defendant.  [Id.].  In minutes from a November 2011 meeting of Defendant's company, ALM Research LLC ("ALM"), Defendant wrote about having Plaintiff "negotiat[e] business deals" and "bring new business opportunities to ALM" for a "[p]ercentage of royalties."  [ECF No. 93-2 at 3].  Defendant further wrote that he wanted to "[f]ormaliz[e] [a] [r]oyalty [c]ontract with [Plaintiff]" and referenced "[t]he verbal agreement."  [Id.].

The parties agree that no written document outlining their oral agreement exists.  [DSOF at 15–16].  Plaintiff has described the April and June 2010 emails as simply discussing "the terms of a draft contract."  [Id. at 16 (emphasis omitted); ECF No. 88-3 at 32 (Plaintiff's deposition testimony); ECF No. 88-6 at 4 (Plaintiff's response to Interrogatory No. 1, in which he stated, "I do not recall the specifics of any writing that memorializes the terms of the agreement, but Dr. Millett's Answer and Counterclaim describes the terms of a draft contract.")].

In May 2010, Plaintiff contacted R. Schmieding to discuss Arthrex's entering into a royalty agreement with Defendant, and in August 2010, Plaintiff contacted J. Schmieding to discuss the same.  [DSOF at 22].  J. Schmieding testified that during their conversation, Plaintiff did not reference a royalty rate or discuss specific provisions of a royalty agreement, nor did he reference any potential opportunities for Defendant with Arthrex competitors.  [ECF No. 98-3 at 28–30 (J. Schmieding deposition testimony)].  On August 18, 2010, R. Schmieding sent an email to the CEO of the Steadman Clinic, where Defendant worked, stating that ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████

On August 17, 2010, one day prior to speaking with Plaintiff, J. Schmieding sent Defendant a draft royalty agreement for review.  [ECF No. 84-1 at 21 (sending draft); id. at 20

(noting that Plaintiff had called)].  This draft agreement provided for a ███████████ on

SpeedBridge products.  [PSOF at 19].  Defendant and Arthrex were already parties to a ███████

█████████████████████████████████████████████████████████████████.  [ECF

No. 98-10 at 2–10 ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████].  In addition, Defendant and Arthrex were parties to a

████████████████████████████████████████████████████████████

████████████████████████  [PSOF at 23].

On or around September 2, 2010, Defendant entered into a royalty agreement with

Arthrex ("2010 Royalty Agreement" or "Agreement"), which included royalties on products

associated with SutureBridge and SpeedBridge, as well as other products.  [DSOF at 19; ECF

No. 88-13 (2010 Royalty Agreement)].  The Agreement provided for a 4% royalty rate on post-

January 1, 2010 sales of SutureBridge and SpeedBridge products, and a 2% royalty rate on sales

of the same products between March 1, 2006 and December 31, 2009.  [PSOF at 21; ECF No.

88-13 at 10].  Defendant and J. Schmieding negotiated the terms of the 2010 Royalty Agreement.

[DSOF at 22].[5]  The term, or duration, of the Agreement was five years, with royalty payments

on SutureBridge and SpeedBridge products to begin retrospectively from March 31, 2006 (the

date of first sale) and to end on March 31, 2016.  [Id. at 20; ECF No. 88-13 at 5; id. at 10 (setting

out the expiration date on royalty payments for SutureBridge and SpeedBridge products as

---

[5] Plaintiff disputes this, noting that he spoke with J. Schmieding and R. Schmieding, [DSOF at 22], however, he testified that Defendant negotiated the 2010 Royalty Agreement independently, [ECF No. 88-3 at 49].

March 31, 2016, "10 yrs from 1st sale")].  The 2010 Royalty Agreement could be ████████████

██████████████████████████████████████  [ECF No. 88-13 at 6].[6]

Beginning in 2010, Defendant paid Plaintiff 10% of all royalties he received from

Arthrex under the 2010 Royalty Agreement, [DSOF at 24], and also paid Plaintiff 10% of his

royalties on a product that was not included in the 2010 Royalty Agreement, [PSOF at 28; ECF

No. 84-5 at 23].  Defendant testified that he paid these sums partly because Plaintiff was a friend

and was going through a difficult time and partly because he wanted Plaintiff to continue finding

other opportunities for him.  [DSOF at 24].  Plaintiff disputes that he was required to bring

additional opportunities to Defendant under their arrangement, [id. at 25], but admits that he did

not perform any services for or bring new opportunities to Defendant after 2010, [id. at 26].

Defendant's wife was the bookkeeper for Defendant's business and issued payments to

Plaintiff.  [DSOF at 28].  She testified that she was sometimes late in making payments to

Plaintiff because she was busy raising a family and running her own business.  [Id.].[7]  In

addition, although Defendant instructed her to reduce Arthrex's annual royalty payment to

Defendant by $150,000.00 before calculating and paying Plaintiff his 10%, she inconsistently did

---

[6] Plaintiff disputes this, arguing that the 2010 Royalty Agreement was ████████████████



This is reflected in a ████████████  [Id. at 9].

[7] Plaintiff suggests that Defendant purposefully delayed payments to him but cites no evidence in
support of this allegation beyond his own affidavit, in which he states his belief that delays were
purposeful.  See [DSOF at 28–29; ECF No. 95 at 2 (Plaintiff's affidavit, stating that Defendant
"would periodically intentionally delay royalty payments to me during the five years that he paid
me pursuant to our Verbal Agreement.  I believe this was part of his effort to get me to agree to
accept fewer payments than he was required to make to me.")].  As Defendant notes, Plaintiff
has not provided evidence as to how long the delays were, how frequent, or when the delays
occurred.  [DSOF at 29].

so.  [Id.].  Defendant received $12,736,837.28 in royalty payments from Arthrex through the first

quarter of 2018.  [PSOF at 28].  Prior to entering into the 2010 Royalty Agreement, Defendant

had received ███████████████████████ in ████ , and ██████████████ in ████ or ████ .

[Id.].  All told, Defendant paid Plaintiff approximately $605,000.00 (roughly 10% of the

royalties he received through the second quarter of 2016) and made his final payment to Plaintiff

on June 30, 2016.  [DSOF at 30].

In July 2013, Defendant sent Plaintiff a draft release agreement ("2013 Draft Release").

[DSOF at 27; PSOF at 25].  Defendant testified that he sent the 2013 Draft Release because he

wanted to resolve a disagreement about the terms of their 2010 oral agreement, though Plaintiff

disputes that they had a disagreement about those terms.  [DSOF at 27].  Plaintiff did not sign the

2013 Draft Release.  [Id.].

In November 2015, Arthrex sent Defendant an email indicating that the term of the 2010

Royalty Agreement was set to expire.  [PSOF at 26].  Defendant responded, stating that he

thought Arthrex would want to renew the Agreement.  [Id.].  ████████████████████████

████████████████████████████████████████████████████ [Id.

at 26–27].  There is no documentation of the ████████████████████████████

████████████████████ [Id. at 27].  Defendant and J. Schmieding testified that they negotiated

the terms of the extension.  [Id.].  On August 29, 2016, Defendant left Plaintiff a voicemail

stating that the 2010 Royalty Agreement had "a term limit."  [DSOF at 31; ECF No. 103 at 19].

That same day, he sent Plaintiff an email stating that "[t]he agreement was in fact time limited"

and suggesting that Plaintiff help him identify new opportunities.  [ECF No. 103 at 22].  ██

████████ , Arthrex and Defendant ██████████████████████████████

████████████████████████████████████████████████████████████

[PSOF at 30].  ████████████████████████████████████████

██████   [Id. at 30–31].  In addition, ███████████████████████████████████

███████████████████████████████████████████████   [Id. at 30].

Plaintiff was fired from Surgi-Care in 2011, and though he has had several jobs since, he acknowledges that those job changes were unrelated to Defendant or Arthrex.  [DSOF at 3, 31]. Plaintiff did not pursue employment with Arthrex, Smith & Nephew, or Linvatec after 2010.  [Id. at 32].  No one told Plaintiff that his relationship with Arthrex had suffered due to his efforts to help Defendant enter into a royalty agreement with the company, though Plaintiff notes that in 2010, R. Schmieding expressed frustration with the parties' negotiating tactics.  [Id. at 31–32].

## II.    CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.    Background

On October 17, 2017, Plaintiff filed a complaint against Defendant and ALM (collectively with Defendant, "Defendants") in Middlesex Superior Court.  [ECF No. 1-1]. Defendants jointly removed the state court action to this Court on November 13, 2017.  [ECF No. 1].  On May 3, 2018, the Court granted Defendants' motion to dismiss and allowed Plaintiff to amend his complaint, [ECF No. 14], which he did on May 21, 2018, [ECF No. 15].  ALM then filed a motion to dismiss the complaint as to Plaintiff's claims against ALM only, [ECF No. 17], which the Court granted on January 14, 2019, [ECF No. 26].

On January 15, 2020, Plaintiff filed a motion for partial summary judgment as to Count I of his amended complaint (breach of contract), [ECF No. 80], and Defendant filed a motion for summary judgment as to all counts, [ECF No. 85].  Defendant opposed Plaintiff's motion, [ECF No. 96], and Plaintiff filed a reply, [ECF No. 103].  Plaintiff likewise opposed Defendant's motion, [ECF No. 93], and Defendant filed a reply, [ECF No. 104].

**B.     Legal Standard**

Summary judgment is appropriate where the moving party can show that "there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor
of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg
v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect
the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d
1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is
evidence from which a reasonable trier could decide the fact either way." Id. (citation
omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence
is insufficient to support the nonmoving party's case." United States v. One Parcel of Real Prop.
(Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex
Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving
party must "'affirmatively produce evidence that negates an essential element of the non-moving
party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the
non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández
v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124,
132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary
judgment, the nonmoving party must establish a trial-worthy issue by presenting enough
competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v.
Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation
omitted).  That is, the nonmoving party must set forth specific, material facts showing that there

is a genuine disagreement as to some material fact.  One Parcel of Real Prop., 960 F.2d at 204

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's

favor."  Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this review "is

favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v.

Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both

genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir.

2012), and the Court may discount "conclusory allegations, improbable inferences, and

unsupported speculation."  Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds

Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### C.    Discussion

Plaintiff seeks summary judgment on his breach of contract claim, asserting that the

parties entered into an enforceable oral agreement under which Defendant would pay Plaintiff a

commission on royalties received for SpeedBridge products for the duration of a royalty

agreement between Defendant and Arthrex.  [ECF No. 81 at 11].  Defendant seeks summary

judgment on all of Plaintiff's claims, primarily arguing that the statute of frauds renders any oral

agreement between the parties unenforceable, thereby defeating Plaintiff's other claims, which

are dependent on his breach of contract claim.  [ECF No. 86 at 11].

### 1.    Breach of Contract Claim

The parties agree that no written agreement exists, [DSOF at 15–16], therefore the Court

begins by addressing Defendant's statute of frauds contention.  See [ECF No. 86 at 11].

a.       Massachusetts General Laws ch. 259, § 1

Defendant first argues that any oral agreement between the parties is unenforceable under

Massachusetts General Laws Chapter 259, § 1, which provides that

> [n]o action shall be brought: . . . [u]pon an agreement that is not to be performed
> within one year from the making thereof; [u]nless the promise, contract or
> agreement upon which such action is brought, or some memorandum or note
> thereof, is in writing and signed by the party to be charged therewith or by some
> person thereunto by him lawfully authorized.

Mass. Gen. Laws ch. 259, § 1.  Plaintiff counters that their agreement could have been completed

within one year if Arthrex had refused to enter into a royalty agreement for a term of more than

one year, and that the parties' oral agreement is therefore not subject to the statute of frauds.

[ECF No. 93 at 4].[8]

In order to prove the existence of a contract, written or oral, a plaintiff bears the burden

of demonstrating that there was an "agreement between the parties on the material terms of that

contract, and [that] the parties . . . ha[d] a present intention to be bound by that agreement."

Situation Mgmt. Sys. v. Malouf, Inc., 724 N.E.2d 699, 703 (Mass. 2000).  When assessing

whether a contract is in conflict with the statute of frauds, courts "look to the terms of the

contract, as they reflect the understanding of the parties at the time they entered into the contract,

to determine whether the agreement could have been performed within one year of its making."

Richard Tucker Assocs., Inc. v. Smith, 481 N.E.2d 489, 490 (Mass. 1985).  "For an oral contract

to come within the Statute of Frauds—and be voided by it—the parties must either expressly

stipulate, *or it must appear to have been understood by them*, that the contract was not to be

---

[8] The parties dispute whether their oral agreement was limited to securing a royalty agreement,
or whether it also included Plaintiff's promises to perform consulting work and to bring
additional business opportunities to Defendant.  [DSOF at 24–25].  The scope of the oral
agreement is not material to the Court's statute of frauds analysis as the outcome would be the
same, therefore the Court assumes for present purposes that the oral agreement was, at a
minimum, focused on Plaintiff helping Defendant to obtain a royalty agreement.

performed within a year." Kitaeff v. Johnson (In re Furst), 914 F. Supp. 734, 738 (D. Mass. 1996) (emphasis added).

In Richard Tucker Associates, the Supreme Judicial Court ("SJC") held that an oral agreement to pay a commission to a plaintiff for securing a multi-year real estate lease was barred by the statute of frauds because the parties orally agreed on a commission that would be paid for each year of the lease. 481 N.E.2d at 490. Although it was possible that the plaintiff would have found a tenant that was only willing to enter into a one year lease, the court focused on the intention of the parties, noting that "there [was] no evidence that the parties intended that the commission should be paid within one year after the contract was made" and that "the parties contemplated a lease that could continue for an indefinite number of years." Id. at 491.

Plaintiff does not dispute that he contemplated receiving commissions for more than one year, but argues that it was possible that their oral agreement could have been completed in less than a year because Arthrex might have refused to enter into a long-term royalty agreement. [ECF No. 93 at 5 (citing In re Furst, 914 F. Supp. at 738 (noting that any understanding that a contract was not to be performed within one year must "not [] depend on any contingency" (quoting Joseph Martin, Inc. v. McNulty, 16 N.E.2d 4, 6 (Mass. 1938)))]. Just as the SJC did in Richard Tucker Associates, where the lease might have lasted for only one year, however, the Court must look to the parties' understanding, rather than the potential terms of a royalty agreement, to determine whether performance was anticipated to be complete within a year.

The evidence clearly demonstrates that both Plaintiff and Defendant understood that their oral agreement would extend beyond one year. Although a fixed term or duration of the oral agreement was never reached, Plaintiff repeatedly requested a commission on the life of any royalty agreement. [DSOF at 6, 12; ECF No. 88-8 at 2; ECF No. 88-8 at 3]. This is further evident in Plaintiff's requested relief in his amended complaint for additional commissions on

Defendant's royalty income from Arthrex, either under the 2010 Royalty Agreement or the █████ ████████████████ [ECF No. 15 ¶ 75; ECF No. 81 at 14, 15].  Defendant testified that he thought their oral agreement was good through the initial termination date of the 2010 Royalty Agreement, which was "the first quarter of 2016."  [ECF No. 84-2 at 28 (Defendant's deposition testimony)].  Both Plaintiff and Defendant, therefore, understood that commission payments in connection with Plaintiff's assistance in securing a royalty agreement would continue beyond one year.  Even "indulging all reasonable inferences" in Plaintiff's favor, Cochran, 328 F.3d at 6, the Court finds that section 1 of the statute of frauds applies to the parties' oral agreement, see Richard Tucker Assocs., 481 N.E.2d at 490.[9]

> b.    Massachusetts General Laws ch. 259, § 7

Defendant also argues that an additional provision under the statute of frauds which pertains to commissions or fees for brokers and finders, also bars Plaintiff's claims.  [ECF No. 86 at 12].  Plaintiff disputes whether this provision is applicable to their arrangement, arguing that he was neither a broker nor a finder.  [ECF No. 93 at 7].[10]

Individuals seeking a fee or commission for services performed as a finder or broker must obtain an agreement in writing.

> Any agreement to pay compensation for service as a broker or finder . . . shall be
> void and unenforceable unless such agreement is in writing, signed by the party to
> be charged therewith, or by some other person authorized. . . .   The provisions of

---

[9] Plaintiff cites Defendant's payment of royalty fees from 2010 to 2016 as evidence of the parties' belief that they were bound by their oral agreement, however "performance, even if full, does not remove a contract from the operation of G. L. c. 259, § 1, Fifth.  That holding has been repeatedly reaffirmed."  Meng v. Trs. of Bos. Univ., 693 N.E.2d 183, 186 (Mass. App. Ct. 1998).

[10] Plaintiff states in passing that he and Defendant had a partnership agreement, [ECF No. 93 at 6], but has not pled any facts in support of this contention, nor does Plaintiff assert this argument in support of his motion for summary judgment on his breach of contract claim, see [ECF No. 81].

this section shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .

Mass. Gen. Laws ch. 259, § 7.

Massachusetts courts have followed "[t]he modern trend [] to give statutes of frauds liberal interpretations," with particular reference to section 7, "to further [the] policy determination that agreements for compensation for certain services be in writing." Cantell v. Hill Holiday Connors Cosmopulos, Inc., 772 N.E.2d 1078, 1081 (Mass. App. Ct. 2002); see Alexander v. Berman, 560 N.E.2d 1295, 1298 (Mass. App. Ct. 1990) ("Introduction in 1985 of the special business brokerage Statute of Frauds manifested a legislative purpose to discourage claims for commission based on conversation which persons heard differently or remembered differently."); Michael A. Mentuck & Assocs. v. Lloyds Underwriting Syndicate #1209, No. 11-cv-10118, 2012 U.S. Dist. LEXIS 186495, at *7 (D. Mass. Nov. 20, 2012) ("Massachusetts courts construe [this provision of] the statute of frauds liberally to ensure its legislative purpose is served."), recommendation and report adopted at, 2013 U.S. Dist. LEXIS 27945 (D. Mass. Feb. 28, 2013). This broad "interpretation of § 7 renders it applicable to myriad occupations . . . ." Bay Colony Mktg. Co. v. Fruit Salad, 672 N.E.2d 987, 990 (Mass. App. Ct. 1996).

"A broker is 'an agent who acts as an intermediary or negotiator . . . a person employed to make bargains and contracts between other persons . . . .'" Cantell, 772 N.E.2d at 1082 (quoting Black's Law Dictionary 187 (7th ed. 1999)). Meanwhile, "[a] finder is 'an intermediary who brings together parties for a business opportunity . . . . A finder . . . merely brings two parties together to make their own contract, while a broker-dealer usually participates in the negotiations.'" Id. (quoting Black's Law Dictionary 646). Although Plaintiff suggests that a broker or finder must introduce parties who are unknown to each other prior to their potential transaction, case law does not support his position. See id. (stating that a finder brings two

16

parties together without requiring that the finder make an introduction); Alexander, 560 N.E.2d at 1297 (holding that plaintiff was a broker where he brought together two parties to a transaction that had known each other for ten years).  In any case, Plaintiff does not dispute that he introduced Defendant to Arthrex, albeit several years prior to the 2010 Royalty Agreement. [DSOF at 2 (not disputing the statement that "Plaintiff introduced [Defendant] to Arthrex in 2001")].

Plaintiff claims to have participated in negotiations for the 2010 Royalty Agreement, [DSOF at 22 ("Plaintiff urged [J.] Schmieding in a phone conversation in August 2010 to enter into a royalty agreement with [Defendant].  Plaintiff also spoke with [R.] Schmieding about Defendant in May 2010.")], yet he testified that Defendant alone negotiated the Agreement, [ECF No. 88-3 at 49].  Although Defendant argues that the Agreement was solely negotiated between himself and J. Schmieding, [id.; ECF No. 88-1 at 28 (Defendant's deposition testimony)], Defendant testified that he wanted Plaintiff to act as his negotiator, [ECF No. 88-1 at 15].[11]

Assuming a dispute between the parties regarding Plaintiff's role in negotiating the 2010 Royalty Agreement, the Court notes that courts have not imported a requirement that a broker engage in negotiations, but instead define a broker as "an agent who acts as an intermediary *or* negotiator.'"  Cantell, 772 N.E.2d at 1082 (emphasis added).  Courts have determined that a party was a broker or finder where he or she "worked to obtain a good faith offer to purchase [a] product from bona fide purchasers," Mentuck, 2012 U.S. Dist. LEXIS 186495, at *9, was willing to "serv[e] as an intermediary that was willing to negotiate" even though no negotiations took place, Cantell, 772 N.E.2d at 1082, was able to bring two interested parties together to facilitate a

---

[11] In his memorandum in support of the motion for summary judgment, Defendant takes the position that Plaintiff served as his broker or finder.  [ECF No. 86 at 12–13].

deal, <u>Alexander</u>, 560 N.E.2d at 1297, or "simply identified valuable information," <u>State Tax</u>

<u>Auditing & Research v. Waters Corp.</u>, No. 98-2594-B, 2000 Mass. Super. LEXIS 134, at *8

(Mass. Super. Ct. Apr. 5, 2000).  None of these courts required that the party determined to have

been a broker or finder engaged in negotiations, and these cases evidence instead a broad

application of the statute to activities similar to Plaintiff's.

    While the Court must "indulg[e] all reasonable inferences in [the non-moving] party's

favor," <u>Cochran</u>, 328 F.3d at 6, Plaintiff has provided evidence, including his own testimony, to

support a finding that he acted as either a finder or broker by serving as an intermediary between

the Defendant and Arthrex.  <u>See, e.g.</u>, [ECF No. 15 ¶ 31 ("Having other options for [Defendant]

on the table would give the parties leverage to go back to Arthrex and Reinhold and negotiate a

royalty compensation agreement for [Defendant].");  ECF No. 88-3 at 37 (Plaintiff's testimony

that "I was only obligated to help [Defendant] to leverage Arthrex and get Arthrex to the table");

ECF No. 84-1 at 19 (August 18, 2010 email from Defendant to J. Schmieding, stating that

Plaintiff "helped connect me with your company 10 yrs [sic] ago" and "knows the history well

and is acting in good faith to try to help us move forward . . . .  You certainly have my

permission to speak with him");  ECF No. 88-8 at 2 (June 7, 2010 email from Plaintiff to

Defendant, stating that "I thought we agreed that I would be paid 10 percent of any royalties that

you were paid by [S]mith [&] [N]ephew or Arthrex . . . *based on our negotiations* with [R.

Schmieding] and by creating the leverage for you to leave by having a deal on the table with

Smith [&] Nephew" (emphasis added));  ECF No. 88-6 at 8 (Plaintiff's interrogatory response,

stating that "we approached Arthrex and demanded that they put [Defendant] on a royalty

deal")].

Thus, Plaintiff's activities put him within the statute's liberally construed definition of a broker or finder, and section 7 of the statute of frauds therefore also applies to the oral agreement between Plaintiff and Defendant.  See Cantell, 772 N.E.2d at 1082.[12]

   c.  Whether the Statute of Frauds Is Satisfied

Plaintiff argues that, even if the statute of frauds applies to the oral agreement with Defendant, the 2013 Draft Release that Defendant sent to Plaintiff satisfies the writing requirement.  [ECF No. 93 at 11].  Defendant counters that the 2013 Draft Release is inadmissible as an offer of settlement under Federal Rule of Evidence 408, and that even if it were admissible, it would not satisfy the statute of frauds.  [ECF No. 104 at 6].

"Whether a writing satisfies the Statute of Frauds is a question of law."  Simon v. Simon, 625 N.E.2d 564, 567 (Mass. App. Ct. 1994).  "[I]n order for a writing to satisfy the Statute of Frauds it must contain directly, or by implication, all of the essential terms of the parties' agreement," id., though there is no requirement that all of the essential terms be contained within a single document, Corp. Dev. Assocs. v. Staples, Inc., No. MICV2011-00958-F, 2013 Mass. Super. LEXIS 9, at *11 (Mass. Super. Ct. Jan. 31, 2013) (stating that "multiple emails between parties, so long as they contain all essential terms, may create a binding contract and satisfy the statute of frauds ").

---

[12] Plaintiff suggests that because he did not hold himself out as a broker or finder, and because neither he nor Defendant referred to Plaintiff as such, Plaintiff was not a broker or finder.  [ECF No. 93 at 7–8].  Yet neither case law nor the statute requires an individual to represent him or herself as a "broker" or "finder."  Instead, a party's actions may qualify him or her as a broker or finder regardless of how he or she labels his or her services.  See Mass. Gen. Laws ch. 259, § 7; Cantell, 772 N.E.2d at 1081 (disregarding party's contention that because it was an employment agency it was not a "broker" or "finder").  This is consistent with the liberal construction of the statute and legislative intent.  See Cantell, 772 N.E.2d at 1081; Alexander, 560 N.E.2d at 1298 (stating that the legislative intent was to "discourage claims for commission based on conversation which persons heard differently or remembered differently").

Despite Plaintiff's protestations to the contrary, [ECF No. 81 at 12; ECF No. 93 at 16–17], how long Defendant was obligated to pay Plaintiff is undoubtedly an essential term within the context of an agreement for commissions, see Early & Assocs. v. IBM, No. 06-P-873, 2007 Mass. App. Unpub. LEXIS 806, at *8 (Mass. App. Ct. Aug. 28, 2007) (identifying the essential terms of a contract for commissions to include "the amount of the commission, the time for payment, the duration of the contract, and most importantly, the parties' rights and obligations"); Here,

> [t]he contract, as recited, . . . is silent as to the duration of the agreement, the duration of any period for which Defendants would be entitled to a commission, the ability of the parties to terminate the agreement, and the terms, if any, that would regulate any such termination.  While the absence of any one of these terms may not have rendered the contract unenforceable, in aggregate these omissions render the purported contract too indefinite to be enforced by this Court.

Conway v. Licata, 104 F. Supp. 3d 104, 114 (D. Mass. 2015).[13]

Absent a term specifying the duration of payments due, a plaintiff could—as Plaintiff does here—seek payments indefinitely, which is precisely the harm that the Massachusetts legislature sought to prevent in enacting Massachusetts General Laws Chapter 259, § 7.  See Alexander, 560 N.E.2d at 1298 (stating that the legislative intent was to "discourage claims for commission based on conversation which persons heard differently or remembered differently").  It is clear from the parties' testimony and from contemporaneous emails from 2010 that the oral agreement did not establish the duration of time that payments were due to Plaintiff, much less a meeting of the minds as to this essential term of the agreement.  As for the 2013 Draft Release, the Court need not reach the question of its admissibility, but merely notes that it suffers from the

---

[13] Aside from duration, the parties' oral agreement is also vague as to Plaintiff's obligations.  For example, Defendant argues—and Plaintiff's 2010 emails to Defendant suggest—that Plaintiff was to help secure a royalty agreement, as well as to help identify other opportunities for Defendant.  See [DSOF at 24].  Yet Plaintiff disputes that he had any ongoing obligations to Defendant after helping to secure the 2010 Royalty Agreement.  [Id. at 25].

same deficit as the April and June 2010 emails in which the parties further negotiated terms of their oral agreement: namely, the 2013 Draft Release specifies a planned termination date for payments under the terms of the release agreement itself, but it does not identify the planned duration of payments due under the parties' 2010 oral agreement.  See [id.].

The Court finds that there is no writing to satisfy the statute of frauds, and that the parties' oral agreement is therefore unenforceable.  See Richard Tucker Assocs., 481 N.E.2d at 491 ("The agreement falls within the Statute of Frauds, G. L. c. 259, § 1, and is unenforceable."); Alexander, 560 N.E.2d at 1297 ("Any oral agreement [between] the parties . . . is unenforceable under § 7, which expressly requires such an agreement to be in writing.").

### 2. Plaintiff's Remaining Claims

#### a. Promissory Estoppel

By its terms, section 7 of the Statute of Frauds, pertaining to commissions for brokers or finders, applies to contracts implied in fact or in law.  Mass. Gen. Laws ch. 259, § 7.  "Courts have held that claims of promissory estoppel . . . are included in this category and that recovery on such claims is therefore barred by the statute."  N. E. Tech. Sales v. Barshad, No. 99-1427-B, 2000 Mass. Super. LEXIS 397, at *12–13 (Aug. 14, 2000) (collecting cases).[14]  Thus, Plaintiff's

---

[14] Even if the Court had not found that section 7 applied, promissory estoppel, as "an action based on reliance[,] is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration."  R.I. Hosp. Tr. Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1179 (Mass. 1995).  Plaintiff would therefore have faced an insurmountable hurdle because, as the Court has already noted, the oral agreement did not establish at least one material term: the agreement's duration.  See Conway, 104 F. Supp. 3d at 114; Targus Grp. Int'l, Inc. v. Sherman, 922 N.E.2d 841, 850 (Mass. App. Ct. 2010) ("Ambiguous or indeterminate material terms can render an attempted agreement too uncertain for enforcement.").

promissory estoppel claim is not viable in light of the Court's finding that section 7 applies to the parties' oral agreement.

b.      Chapter 93A

As to Plaintiff's Chapter 93A claim, it too must fail because "a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." Duclersaint v. Fed. Nat'l Mortg. Ass'n, 696 N.E.2d 536, 540 (Mass. 1998); see Donahue v. Heritage Prop. Inv. Tr., Inc., 2006 Mass. Super. LEXIS 471, at *37 (Mass. Super. Ct. Sept. 5, 2006) ("Further, it would be against public policy for this court to enforce a contract that is unenforceable due to the Statue of Frauds through a Chapter 93A claim, where the action is based solely upon a simple breach of an oral agreement, full performance, or unjust enrichment. 'Therefore, in order to show a violation of c. 93A, the plaintiff must show "unfair or deceptive acts or practices," other than the breach.'" (citation omitted) (quoting Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1217 (Mass. App. Ct. 1989))).  Plaintiff's allegations and the evidence submitted by the parties indicate only that Defendant sought to clarify missing terms of the parties' unenforceable oral agreement, and eventually stopped payments when he believed they were no longer due.  This amounts to "a good faith dispute as to whether money is owed," Duclersaint, 696 N.E.2d at 540, rather than proof of an unfair or deceptive act.

c.      Declaratory Judgment and Injunctive Relief

Finally, because the Court has found that the parties' oral agreement is unenforceable, Plaintiff's claim for a declaratory judgment fails.  See McGillen v. JP Morgan Chase Bank, N.A., No. 19-cv-11917, 2020 U.S. Dist. LEXIS 19868, at *18 (D. Mass. Jan. 31, 2020) ("Because their claim for declaratory judgment is based on the same actionable conduct that underlies their tort and Chapter 93A claims, which are time-barred, their claim for declaratory judgment fails for the same reason."); Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 452 (D. Mass. 2012) (stating

that "dismissal of the underlying claims requires dismissal of the claim for declaratory relief as well").  Similarly, Plaintiff's request for an injunction directing Defendant to make additional payments to Plaintiff under the oral agreement, see [ECF No. 15 at 78], also fails as the Court has found that the oral agreement is unenforceable.

3.   Summary

Plaintiff has failed to "establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to [him as] the nonmoving party."  ATC Realty, LLC, 303 F.3d at 94.  While the Court must make reasonable inferences in Plaintiff's favor, it may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6.  Having applied this standard to the evidence presented by the parties, the Court finds that the parties' oral agreement is unenforceable under sections 1 and 7 of the Massachusetts statute of frauds.  See Mass. Gen. Laws ch. 259, §§ 1, 7.  As a result, Plaintiff's breach of contract claim and related claims must fail.  Defendant's motion for summary judgment, [ECF No. 85], is therefore GRANTED, and Plaintiff's motion for partial summary judgment, [ECF No. 80], is DENIED.

## III.   PLAINTIFF'S MOTION TO AMEND

### A.   Background

On October 17, 2017, Plaintiff filed a complaint against Defendant and ALM, [ECF No. 1-1], which Plaintiff subsequently amended on May 21, 2018, [ECF No. 15].  On March 27, 2019, after a scheduling conference, [ECF No. 32], the Court entered a scheduling order which set April 30, 2019 as the deadline to amend pleadings.  [ECF No. 33 at 1].  Discovery closed on December 6, 2019, after Plaintiff filed an assented-to motion for an extension only as to the discovery deadline.  [ECF No. 53].  On December 13, 2019, Plaintiff filed a motion for leave to

file a second amended complaint, [ECF No. 68], which Defendant opposes, [ECF No. 72].  The

parties filed their motions for summary judgment on January 15, 2020.  [ECF Nos. 80, 85].

    **B.**    **Legal Standard**

Federal Rule of Civil Procedure 15 states that leave to amend should be "freely give[n]

. . . when justice so requires."  Fed. R. Civ. P. 15(b)(1).  "At a certain point," however, "this

amendment-friendly regime may cease to govern."  U.S. ex rel. D'Agostino v. EV3, Inc., 802

F.3d 188, 192 (1st Cir. 2015).  In cases where a district court has issued a scheduling order under

Rule 16(b) and the amendment sought contravenes a deadline imposed by the court, "Rule

16(b)'s more stringent good cause standard supplants Rule 15(a)'s leave freely given standard."

Id. (first citing Cruz v. Bristol-Myers Squibb Co., P.R. Inc., 699 F.3d 563, 569 (1st Cir. 2012);

then citing Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 327 (1st Cir. 2008)).

"If [the Court] considered only Rule 15(a) without regard to Rule 16(b), [it] would render

scheduling orders meaningless and effectively would read Rule 16(b) and its good cause

requirement out of the Federal Rules of Civil Procedure."  Sosa v. Airport Sys., Inc., 133 F.3d

1417, 1419 (11th Cir. 1998); see also O'Connell v. Hyatt Hotels, 357 F.3d 152, 155–56 (1st Cir.

2004) (citing Sosa with approval).

When a motion for summary judgment is pending at the time amendment is sought, a

different standard applies.  Torres-Matos v. St. Lawrence Garment Co., 901 F.2d 1144, 1146 (1st

Cir. 1990) (stating that a pending motion for summary judgment requires a plaintiff to

demonstrate that the proposed amendments have "substantial merit" and are "supported by

substantial and convincing evidence").  Here, however, Plaintiff's motion to amend was filed on

December 13, 2019, one month before the parties' motions for summary judgment were filed,

[ECF Nos. 80, 85], therefore the good cause standard applies to Plaintiff's motion.  See

Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) ("[This] standard, which

requires that proposed amendments have substantial merit and be supported by substantial and convincing evidence, is inapplicable for several reasons. To date, it has only been applied where the motion to amend is made after a defendant has moved for summary judgment."); see also Gray v. United States, No. 10-cv-00467, 2011 U.S. Dist. LEXIS 127998, at *13–14 (D. Me. Oct. 31, 2011) ("[I]n this case, the appropriate standard is the 'good cause' standard of Federal Rule [of] Civil Procedure 16(b), the deadline for amending pleadings having passed, but the defendant not having moved for summary judgment.").

"Rule 16(b)'s 'good cause' standard emphasizes the diligence of the party seeking the amendment." O'Connell, 357 F.3d at 155. Under this inquiry, "[p]rejudice to the opposing party remains relevant but is not the dominant criterion." Id. Rather, "'[i]ndifference' by the moving party" may preclude leave to amend "irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause." Id. (citation omitted). "Particularly disfavored are motions to amend whose timing prejudices the opposing party by 'requiring a re-opening of discovery with additional costs, a significant postponement of trial, and a likely major alteration in trial tactics and strategy . . . ." Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) (quoting Acosta-Mestre v. Hilton Int'l of P.R., Inc., 156 F.3d 49, 52 (1st Cir. 1998)). "As a case progresses, . . . the burden on a plaintiff seeking to amend a complaint becomes more exacting." Id.

### C.   Discussion

Plaintiff proposes to add the following to his complaint: (i) a claim for breach of the implied covenant of good faith and fair dealing, (ii) a claim for fraudulent misrepresentation, (iii) a claim for negligent misrepresentation, and (iv) additional allegations in support of his claim under Massachusetts General Laws Chapter 93A. See [ECF No. 68 at 42–47 (Plaintiff's proposed second amended complaint)].

25

Plaintiff states that he filed his December 13, 2019 motion to amend in response to new evidence obtained in the two months prior to filing his motion, including (1) Defendant's deposition testimony taken in October 2019, (2) deposition testimony from J. Schmieding and R. Schmieding taken in early December 2019, and (3) documents Defendant produced in September 2019.  [ECF No. 69 at 5–6, 11].  Defendant counters this by noting that Plaintiff's request is untimely and caused by Plaintiff's lack of diligence.  [ECF No. 72 at 6–7].  In addition, Defendant states that the information Plaintiff claims to be "newly discovered" was available to Plaintiff as early as September 9, 2019, when Defendant produced one of the documents Plaintiff cites in his motion, and that other information has always been publicly available through the federal government's online Open Payments database, which tracks payments that medical device companies, like Arthrex, make to physicians.  [Id. at 8].

Discovery in this case commenced in late March 2019.  [ECF No. 33].  Plaintiff states that it was his strategy to depose Defendant and serve his written discovery requests "towards the end of fact discovery" and after Defendant had deposed Plaintiff.  [ECF No. 69 at 4–5].  As a result of this strategy, Plaintiff did not serve his discovery requests until August 9, 2019, [ECF No. 73-9 at 2], just over four months into discovery and just under two months before discovery was originally scheduled to close on October 25, 2019, [ECF No. 33].  Plaintiff then waited until September 23, 2019 to serve subpoenas on R. Schmieding and J. Schmieding: one month before discovery was set to close.  [ECF No. 73-11 at 2–30].  While Plaintiff was entitled to pursue his "specific strategic reasons for [his] decision to proceed with discovery" on this timeline, [ECF No. 74 at 2], he must now face the consequences of his decision to sacrifice four months of discovery.  Even absent those lost months, Plaintiff obtained additional time for discovery after the Court granted his assented-to request to extend discovery through December 6, 2019.  [ECF No. 53].  Given Plaintiff's strategy, he could have requested an extension to the deadline for

amendments to the pleadings set out in the Court's Scheduling Order, [ECF No. 33 at 1], but he never did. Where "[t]he 'good cause' standard focuses on the diligence (or lack thereof) of the moving party," Flores-Silva v. McClintock-Hernandez, 710 F.3d 1, 3 (1st Cir. 2013), Plaintiff has not demonstrated good cause for his eleventh-hour request to file a second amended complaint.

Even if the Court were to apply the "substantial merit" standard that requires proposed amendments to be "supported by substantial evidence" when a motion to amend is filed after motions for summary judgment, Torres-Matos, 901 F.2d at 1146, the Court would deny Plaintiff's proposed amendment. Based on the Court's findings, supra Section II, regarding the parties' motions for summary judgment, Plaintiff's proposed amendments lack merit. "Without a valid, enforceable contract in place, there can be no implied covenant of good faith and fair dealing." Corp. Dev. Assocs., 2013 Mass. Super. LEXIS 9, at *15 (citing Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991)). Plaintiff's failed breach of contract claim also dooms his proposed addition of misrepresentation and amended Chapter 93A claims: "there can be no action for an alleged violation of G.L.c. 93A or misrepresentation because those claims are also derivative of the breach of contract claim . . . ." Id. at *16.[15] Plaintiff's proposed

---

[15] The Court notes that, as to Defendant's alleged misrepresentations regarding the term of the 2010 Royalty Agreement, [ECF No. 69 at 10], where the Court has found that the parties' oral agreement regarding commissions on the Agreement is unenforceable, whether Defendant misrepresented or simply misunderstood the terms of the 2010 Royalty Agreement and its implications for the parties' oral agreement is immaterial. See Corp. Dev. Assocs., 2013 Mass. Super. LEXIS 9, at *15. In any case, Plaintiff's proposed misrepresentation claims lack substantial merit as he has failed to show that he relied on Defendant's August 2016 statements. Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 47 (Mass. 2009) (stating that both negligent and fraudulent misrepresentation claims require a plaintiff to show that he or she relied on a defendant's false statement). Plaintiff emailed Defendant in October 2016, challenging Defendant's statements regarding the termination of the 2010 Royalty Agreement and demanding additional payments, thereby establishing that he did not rely on Defendant's statements. See [ECF No. 73-25 at 2–3 (October 5, 2016 email from Plaintiff to Defendant)].

"amendment is properly classified as futile" because the allegations contained in his proposed amended complaint, filed after the close of discovery and on the eve of the deadline for the filing of summary judgment motions, are not "supported by substantial evidence." Hatch v. Dep't for Children, 274 F.3d 12, 19 (1st Cir. 2001).

Under either the good cause standard or the substantial merit standard, Plaintiff's motion to file a second amended complaint, [ECF No. 68], is DENIED.

## IV.   CONCLUSION

Accordingly, Defendant's motion for summary judgment, [ECF No. 85], is GRANTED. Plaintiff's motion for leave to file a second amended complaint, [ECF No. 68], and motion for partial summary judgment, [ECF No. 80], are DENIED.

**SO ORDERED.**

October 26, 2020                                                    /s/ Allison D. Burroughs
                                                                   ALLISON D. BURROUGHS
                                                                   U.S. DISTRICT JUDGE

28